[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-12804

_____

WARREN KING,

Petitioner-Appellant,

*versus*

WARDEN, GEORGIA DIAGNOSTIC PRISON,

Respondent- Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 2:12-cv-00119-LGW

_____

Before WILLIAM PRYOR, Chief Judge, and WILSON and GRANT, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

Warren King, a Georgia prisoner sentenced to death, appeals the denial of his petition for a writ of habeas corpus. King contends that the Georgia courts unreasonably adjudicated his objection that the prosecutor exercised discriminatory strikes during jury selection, unreasonably concluded that King received effective assistance of counsel in the investigation and presentation of his mental-health and mitigation evidence, and unreasonably rejected his challenge to the procedure for establishing intellectual disability in capital cases. King also argues that the district court erred when it ruled that he forfeited any further claim based on his alleged intellectual disability. We affirm.

## I. BACKGROUND

This background section contains four parts. First, we explain King's crime of conviction. Second, we describe his counsel's preparation for trial, the trial itself, and sentencing. Third, we describe the jury selection and objections. Fourth, we describe King's unsuccessful appeal and state and federal habeas corpus petitions.

### A. King's Crime

A little after midnight on September 14, 1994, Karen Crosby closed the convenience store where she worked and walked to her car. But before she arrived there, Warren King and his cousin, Walter Smith, ordered her at gunpoint to surrender the keys to the

store. *See King v. State*, 539 S.E.2d 783, 789 (Ga. 2000). Smith entered the store to rob it and left King outside with Crosby and the gun. *Id.* Smith set off the store's alarm and ran from the store. *Id.* According to King's testimony at sentencing, "Smith yelled at him repeatedly to shoot Crosby," but he instead gave the gun back to Smith, who killed Crosby. *Id.* Smith testified at trial that he heard King shoot Crosby while he attempted to rob the store and saw her already falling to the ground when he turned to look. *Id.*

A jury convicted King of malice murder, armed robbery, burglary, aggravated assault, false imprisonment, and possession of a firearm during the commission of a crime. At trial, King attempted to paint Smith as the leader of the robbery and the shooter, and, in the alternative, he sought a verdict of "guilty but mentally retarded" to avoid a death sentence. *See* GA. CODE § 17-7-131(c)(3), (j) (1998). But the jury found him "guilty" and eligible for the death penalty. *See King*, 539 S.E.2d at 788 & n.1.

*B. Pre-Trial Investigation and Presentation of Evidence Regarding Intellectual Disability*

After King's arrest and indictment, the trial court appointed George Terry Jackson and George Hagood to represent King. Jackson, the lead counsel, had participated in over 50 capital cases and at least 15 capital trials. But Jackson provided ineffective assistance in one of those capital cases, tried three years before King's trial. *See Terry v. Jenkins*, 627 S.E.2d 7, 8, 10 (Ga. 2006). King's defense team met "at least once a week" during the investigation to coordinate. They acquired educational materials, attended seminars, and

met with representatives from the Southern Center for Human Rights and from the public defender's office to discuss best practices for intellectual-disability defenses.

Counsel investigated and prepared two defense theories. First, they sought to prove that Smith, not King, led the crime and shot Crosby. Second, they sought to prove that King was intellectually disabled and ineligible for the death penalty.

To support these two theories, they collected records pertinent to King's mental capacity, background, and disposition as a "follower." They interviewed King, who gave his account of events and biographical information but denied receiving psychiatric treatment or being abused by his parents. Counsel also interviewed King's sister, Juanita King, who later testified at sentencing. Juanita informed King's counsel about the King family's poverty and their lack of parental supervision and said that he "talk[ed] to himself" and "act[ed] strange," especially after his mother passed away. Counsel also secured records about King's background and mental health, including jail records, hospital files, youth detention center records, and jail psychiatric records. But counsel did not obtain King's file from the Georgia Department of Family and Children's Services, a file that King now asserts had further helpful information and the identity of other witnesses who knew him and his family.

In 1995, jail officials found King lying in the fetal position and in an unresponsive and psychotic state and sent him to a hospital for inpatient psychiatric treatment. After he was discharged, the

trial court granted the prosecutor's motion to send King to a state hospital for an evaluation of his competency to stand trial. One doctor diagnosed King with schizophrenia; another doctor suspected him of malingering and diagnosed him with an antisocial personality disorder; a third doctor found him to be competent to stand trial; and a fourth doctor summarized the results of the other hospital evaluations. The records from these evaluations were not presented at trial, nor did the doctors who attended to King testify or explain the breakdown to the jury. Jackson could not recall later whether he had called the doctors from the state hospital, but he testified that his earlier experiences with the hospital convinced him that the staff there were not helpful to capital defendants.

Two years later, in 1997, King saw Dr. C.E. Beck, a psychiatrist working with inmates at the jail, who evaluated King in several 15-minute sessions. Dr. Beck diagnosed King with schizophrenia and prescribed him corresponding medication. The records from this treatment were not used at trial or in the preparation of the defense's expert witnesses.

King's counsel hired forensic psychologist William Dickinson to evaluate King. Counsel provided Dr. Dickinson with the indictment, King's and Smith's statements, medical records, jail records, juvenile records, school records, and the state hospital records. Dr. Dickinson performed several tests and testified that King fell between being mildly intellectually disabled and the "borderline defective range of measured intellectual functioning." He testified that people with King's capacities, especially those who grow up

without proper parental supervision, are easily led. He also stated that King exhibited some symptoms of schizophrenia. He testified that King was taking medication for schizophrenia, heard voices, and had been huffing gas since he was a child. Dr. Dickinson concluded that King was not malingering.

Counsel also hired Dr. Ernest Miller, a psychiatrist. Counsel provided Dr. Miller with extensive records and Dr. Dickinson's report, and they prepared a letter describing King's history and the breakdown that he suffered in jail. Dr. Miller examined King and diagnosed him with "a borderline intellectual handicap and a personality disorder of mixed type" but did not reach a conclusion as to schizophrenia. He testified that King mentioned hallucinations but that these hallucinations were likely exaggerated.

At Dickinson's and Miller's recommendation, counsel then hired neurologist Dr. Ronald Schwartz. Dr. Schwartz evaluated King and reported that he had a normal neurological examination. But Dr. Schwartz struggled to assess King because he suspected that King was not being completely honest in response to questions.

On Dr. Schwartz's recommendation, counsel hired Dr. Shirley Koehler for a neuropsychological examination, but Dr. Koehler "turned out to be a disappointment," as King's counsel put it during later habeas proceedings. Counsel provided Dr. Koehler with records and medical reports. She administered a series of tests and a CT scan and interviewed King. The CT scan was normal. And based on the tests and interview, Dr. Koehler concluded that

King was malingering. Dr. Koehler's tests suggested that King was not intellectually disabled. She testified against King at trial in support of the State's theory that King was malingering.

At the close of evidence, King moved for a directed verdict on the question whether he was "mentally retarded." The trial court denied the motion. The jury found King guilty of murder and other charges related to the store robbery. *See King*, 539 S.E.2d at 788 & n.1.

At sentencing, King's counsel largely relied on mitigation evidence about his difficult upbringing. They reminded the jury that it could consider the guilt-stage evidence at sentencing. King testified that he participated in the robbery only out of fear and that Smith was the murderer. He also apologized to the victim's family.

Juanita King testified that she cared for King while their mother worked and their father was absent. She explained that their parents were alcoholics and that their father abused their mother. She also testified to the condition of the home King grew up in, which had no running water or telephone. Juanita testified that King had difficulty with basic tasks and needed help to dress himself and to make his bed. She asked the jury to have mercy.

Marjorie Cox, King's former foster mother, spoke positively about King and described him as a happy, respectful child who was simply "very slow." She testified that King never talked about his parents and never wanted to visit them. She testified that King was "definitely a follower," not a leader. Miriam Mitchum, a social worker who assisted King after he was expelled from Cox's home,

described King's house as a dilapidated wooden structure. In her visits to that house, she could not recall a time when King's parents were sober, and she witnessed domestic violence in the home on one of her visits. She corroborated Cox's testimony that King "did much better" in Cox's home than in his parents' and that he was more of a follower than a leader. King's counsel unsuccessfully tried to locate other mitigation witnesses.

King's counsel asked for a sentence of life imprisonment or life imprisonment without parole. Counsel highlighted King's remorse over his crime and his being forced to grow up in a "house of hate" with alcoholic parents. He also made a brief plea for mercy. The jury sentenced King to death for the murder charge.

*C. Jury Selection and King's* Batson *and* J.E.B. *Objections*

King objected to several of the prosecutor's strikes under *Batson v. Kentucky*, 476 U.S. 79 (1986), and *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994). He argued that the prosecutor discriminated against the prospective jurors on the bases of race and sex. The trial court sustained one of King's objections but overruled the others.

After preliminary for-cause strikes of prospective jurors, the parties used peremptory strikes to select 12 jurors out of a pool of 42. Georgia law provided the State with 10 peremptory strikes and the defense with 20. With respect to the 12 potential alternate jurors, the State had three peremptory strikes, and the defense had six. One by one, each potential juror stood. The State marked either "excuse" or "accept" on the strike sheet. If the State marked "accept," the defense could mark "excuse" or "accept." If both the

State and the defense marked accept, then the individual became a member of the petit jury. Selection stopped when 12 jurors had been selected.

Of the 42 members of the main jury pool, there were eight black potential jurors: one black man and seven black women. The State used seven of its peremptory strikes to strike black prospective jurors from this pool, which left only one black potential juror. The State used its remaining three strikes against white women. The State used the only alternate-juror strike it exercised against a black woman. Although white men comprised 45% of the venire pool, the prosecutor did not use any peremptory challenges to remove a white man. The petit jury consisted of seven white men, four white women, and one black man. The three alternate jurors were two white women and one black man.

King challenged the State's strikes as discriminatory because it used seven of its strikes to remove seven of the eight black members of the jury pool, the remaining three strikes to remove women, and an alternate-juror strike against a black woman. The trial court found that the defense had made a prima facie case of unlawful discrimination and required the State to provide race- and sex-neutral reasons for its strikes. *See Batson*, 476 U.S. at 96–97; *J.E.B.*, 511 U.S. at 144–45. Johnson objected to the use of statistical information to establish a prima facie case of discrimination as unfair to the prosecution and, though acknowledging that binding precedent dictated otherwise, "suggest[ed]" that a higher burden be placed on defendants. But he immediately proceeded to provide

the required race- and sex-neutral justifications. We recount only those explanations relevant to this appeal.

The State used its second strike on Jacqueline Alderman, a black woman. The prosecutor, Assistant District Attorney John Johnson, stated that the "main reason . . . [for the strike was] that this lady is a black female, she is from [King's hometown of] Surrency, [and] she knows the defendant and his family." At one point during his justification of the Alderman strike, Johnson mentioned that the State was investigating her husband in an unrelated case, but he quickly backed off of that statement and said it was not the main reason for the strike; the main reason was that she was from Surrency and knew King's family. The trial court concluded that the strike violated *Batson*. It reasoned that Johnson's rationales were shifting and unreliable and that Alderman did not actually know King's family as Johnson had argued.

Johnson then delivered a "soliloquy," in the words of the district court. Johnson called it "improper" for the trial court to tell him that he could not exercise a strike based on where the juror was from. He said that "[i]f this lady were a white lady there . . . would not be a question in this case" and "that's the problem [he] ha[d] with all of this." Johnson criticized *Batson* as "not racially neutral." Before *Batson*, Johnson said, he "had to act . . . [in a racially neutral] way when [he] was in Brunswick because it was a physical impossibility if you wanted to strike every black off a jury for you to do that." But in Johnson's view, "*Batson* now makes us look whether people are black or not" and prevents legitimate strikes, so

it was "improper and . . . wrong." Although Johnson was "very angry," he suggested seating Alderman on the jury to avoid restarting the striking process. The trial court agreed and seated Alderman.

The trial court overruled the rest of King's objections, five of which King cites for the purposes of this appeal. Johnson used his sixth strike on Sarah McCall. He explained that "[s]he is a black female. She indicated that the death penalty was not her first choice. She had a lot of hesitancy about her." Johnson mistakenly stated that her husband, also in the jury pool, said that she opposed the death penalty. But her husband said that they had never discussed the topic. The trial court left the strike in place.

Johnson used his seventh strike on Patricia McTier. He explained that "[s]he is a black female. I struck her because we have prosecuted Wilma McTier for an aggravated assault." Johnson admitted there was some confusion about Patricia McTier's relation to Wilma McTier: Johnson initially thought Wilma was Patricia McTier's brother-in-law instead of her husband's uncle. The trial court overruled King's *Batson* objection.

Johnson used his eighth strike on Jane Ford. Johnson explained that "[s]he is a white female" with two problems as a potential juror. First, "she was a single mother, had no family here, [and] had children and no one to care for those children," and second, she said that she worked with special-education children and enjoyed that work. The trial court overruled King's *J.E.B.* objection to Johnson's strike of Ford.

Johnson used his tenth strike on Lillie Burkett, a black woman. Johnson provided two justifications for striking her. First, he said that "[s]he is a minister" and he "do[es] not take people on juries who are ministers" because they emphasize forgiveness and tend to be overly lenient. Moreover, he said, she knew King's family, and King's family background would be relevant to the trial. The only other minister in the pool was Thomas Lightsey, a white minister whom the parties did not reach because he was the 41st in the lineup and the jury had been selected before he was called. The trial court allowed the Burkett strike.

Finally, Johnson used his alternate-juror strike on Gwen Gillis, a black woman. Gillis, he said, "lived very near" King's aunt and near Gary Andrews, who was Smith's uncle and was the owner of the house where the murder weapon was found. Johnson also asserted that he struck Gillis in order to reach and accept the more favorable prospective alternate juror who followed her. The trial court overruled King's *Batson* objection.

### D. King's Appeal and Habeas Proceedings

King appealed to the Supreme Court of Georgia on several grounds, two of which are relevant here. He argued that Georgia's requirement that a defendant prove his intellectual disability beyond a reasonable doubt in order to avoid the death penalty violated the federal and state constitutions. And he argued that the trial court had allowed *Batson* and *J.E.B.* violations in his jury selection.

The Supreme Court of Georgia affirmed his convictions and sentence. It held that Georgia's procedure for arriving at a "guilty but mentally retarded" verdict was constitutional. *King*, 539 S.E.2d at 798 (citing *Palmer v. State*, 517 S.E.2d 502, 506 (Ga. 1999)); *see also Mosher v. State*, 491 S.E.2d 348, 353 (Ga. 1997). With respect to *Batson* and *J.E.B.*, the court acknowledged that King made his prima facie case of discrimination and that the trial court ordered that Alderman be seated on the jury. *King*, 539 S.E.2d at 795. It reviewed King's *Batson* challenges with respect to McCall, Ford, Burkett, and Gillis, but it did not discuss McTier because King did not challenge that strike on direct appeal. *Id.* at 795–96.

As to McCall, the Supreme Court of Georgia found that Johnson had misstated the record in the course of explaining his strike, but it held that the trial court did not abuse its discretion in overruling King's *Batson* objection. Johnson erroneously said that McCall's husband characterized her as opposed to the death penalty, but "this mistake does not show that the explanation was a mere pretext" for racial discrimination, the court ruled. *Id.* at 796.

As to Ford, the Supreme Court of Georgia affirmed the trial court's decision to allow the strike. Ford was a single mother, so jury service would be a "financial[] burden[]," the court reasoned. *Id.* And it also held it reasonable to credit Johnson's citation of Ford's positive relationship with intellectually disabled children. As the court explained, "[a]lthough seven other jurors, four of them women and one an African-American male, described some

exposure to mentally retarded persons," Ford "was the only person who indicated that she enjoyed that relationship." *Id.*

The Supreme Court of Georgia also held that it was not an abuse of discretion to credit Johnson's explanation of the Burkett strike. Johnson "consistently questioned male and female jurors of all races during voir dire about the roles they served in their places of worship." *Id.* at 795. Moreover, the court found, "none of the other prospective jurors were ministers." *Id.* The record confirmed that Burkett "stated that she knew King's family, a factor that . . . the State was permitted to consider." *Id.*

Finally, the Supreme Court of Georgia affirmed the trial court's ruling that Johnson's strike of Gillis was not discriminatory. The court assumed that, even though Gillis was a prospective alternate juror, erroneously overruling an objection to striking her would not be harmless. *Id.* at 796. But the court concluded that the trial court did not abuse its discretion. *Id.* Gillis not only lived near someone involved in the case but also had "specific personal acquaintances that might have tended to make her sympathetic to the defense." *Id.* (citing *Congdon v. State*, 424 S.E.2d 630 (Ga. 1993)). The court "carefully noted King's argument that other jurors who knew him or members of his family were not stricken by the State" but did not conclude from this fact that Johnson's strike was discriminatory. *Id.* It found credible Johnson's argument that "other factors, which did not apply to those other jurors, contributed to" his decision to strike Gillis. *Id.* The Supreme Court of the United States denied certiorari. *King v. Georgia*, 536 U.S. 957 (2002).

Several years later, King filed a state petition for a writ of habeas corpus. King alleged eight grounds for relief. Only some are relevant to this appeal.

First, King argued that he was denied adequate assistance of counsel at trial and sentencing. *See Strickland v. Washington*, 466 U.S. 668 (1984). In support of this claim, King presented affidavits, reports, and testimony from his family members and psychological experts. Competent counsel, King argued, could have more persuasively argued that he was schizophrenic and not malingering and would have presented better mitigating evidence counseling against a death sentence. In particular, he argued that the records of Dr. Beck's examination of King, which included a firmer schizophrenia diagnosis, or the Central State Hospital records should have been provided to the experts used at trial or directly to the jury. One of the hospital doctors testified that he would have testified that King was not malingering, and another said she would have changed her malingering conclusion and testified in King's favor if she had been provided with more records. Dr. Dickinson testified that testimony from one of King's neighbors corroborated King's schizophrenia. And Dr. Miller testified that further records persuaded him that King "perhaps" was "pre-psychotic" when Dr. Miller evaluated him before trial. King also argued that counsel should have obtained records from the Department of Family and Children's Services that would have provided more background information on King's difficult family background and the behavior of his family. And competent counsel would have developed and presented evidence of his abuse as a child. Finally, King argued that

Mitchum and Cox should have testified at the guilt stage and not just at sentencing.

The superior court rejected King's *Strickland* arguments in a lengthy order. It reasoned that King had the benefit of experienced counsel and that Jackson's prior ineffectiveness in another case was irrelevant to whether he was ineffective in this one. The court found that there was no reliable information about King's being abused as a child or having a family history of mental illness that should have alerted counsel to a need to investigate those issues further. King's experts were given ample records about King to make their diagnoses; the additional materials he pointed to were merely cumulative. The court determined that his experts' testimony that they now had more confidence in a schizophrenia diagnosis did not mean that counsel could have elicited better testimony from them at trial by providing them with more of the same kind of records that they received. The court considered King's citation of Dr. Beck's schizophrenia diagnosis unpersuasive, as Beck's sessions with King lasted only 15 minutes and counsel's hired experts spent far more time with him. And the court ruled that it was a reasonable strategic decision to avoid relying on the hospital that negatively evaluated King and to decline to introduce childhood records that could have opened up King's character for attack by the prosecution. The court concluded that reserving Mitchum's and Cox's testimony for sentencing was a reasonable strategic decision because they were lay witnesses who were not qualified to opine on King's mental capacity.

The court ruled in the alternative that King had not established prejudice from his counsel's alleged errors. Instead, King "merely assert[ed] trial counsel should have presented more witnesses to testify at [his] trial and that those who did testify should have testified to something different." That argument, the court found, was not sufficient to establish ineffective assistance of counsel.

The state habeas court also rejected King's renewed challenge to the state law, GA. CODE § 17-7-131(c)(3) (1998), that required a defendant seeking the "guilty but mentally retarded" verdict to prove his intellectual disability beyond a reasonable doubt. It first ruled that it was bound by the Supreme Court of Georgia's decision on the issue. *See King*, 539 S.E.2d at 798. And it also concluded that the intervening decision by the Supreme Court of the United States in *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that states may not execute intellectually disabled defendants, did not change the outcome of King's claim. In *Atkins*, the state court explained, the "[Supreme] Court specifically referenced Georgia's statute requiring proof of mental retardation beyond a reasonable doubt when it explicitly left to the states the task of developing their own procedures." *Id.* at 313–14, 317. The Supreme Court of Georgia and Supreme Court of the United States denied King's requests for further review. *King v. Humphrey*, 567 U.S. 907 (2012).

King filed a federal petition that alleged nine grounds for relief, and the district court rejected all nine. The district court ruled that King could not overcome the deference federal courts owe to

state-court adjudications under the Antiterrorism and Effective Death Penalty Act, *see* 28 U.S.C. § 2254, as to his *Batson* and *Strickland* claims or his argument that Georgia's burden of proof for an intellectual-disability verdict was unconstitutional. It also determined that King had forfeited his other arguments based on his intellectual disability, such as his argument that he was entitled to a directed verdict as to his intellectual disability. The district court denied King's motion to alter or amend its judgment but granted a certificate of appealability for King's *Batson* claims. We later expanded the certificate to include King's *Strickland* claims, his challenge to the intellectual-disability burden of proof, and the determination that King had forfeited his other intellectual-disability arguments.

## II. STANDARDS OF REVIEW

We review the denial of a petition for a writ of habeas corpus *de novo*. *Jamerson v. Sec'y for Dep't of Corr.*, 410 F.3d 682, 687 (11th Cir. 2005). Our review is governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254. Under that Act, "state-court decisions [must] be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citation omitted). If a state court adjudicated a claim on the merits, we cannot set aside that adjudication unless it was "either 'contrary to, or involved an unreasonable application of, clearly established federal law'" or was an unreasonable determination of the facts in the light of the evidence. *Raulerson v. Warden*, 928 F.3d 987, 995 (11th Cir. 2019) (alteration adopted) (quoting 28 U.S.C. § 2254(d)(1)); *see also* 28 U.S.C. § 2254(d)(2).

A state court unreasonably applies federal law "only if no fairminded jurist could agree with the state court's determination or conclusion." *Raulerson*, 928 F.3d at 995 (internal quotation marks and citation omitted). We evaluate the reasons offered by the court, but if we can justify those reasons on a basis the state court did not explicate, the state-court decision must still stand. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1036 (11th Cir. 2022) (en banc). If the last state court to address an issue did not explain its decision, we "look through" that decision and base our decision on the last reasoned decision provided by a state court. *Wilson v. Sellers*, 138 S. Ct. 1188, 1193–94 (2018). Factual determinations are "presumed to be correct," and that presumption can be overcome only by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). If a state court unreasonably applied federal law or unreasonably determined the facts in a case, we review the underlying claim *de novo*. *Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1250 (11th Cir. 2013).

## III. DISCUSSION

We take each of King's four claims in turn. First, we explain that the Georgia courts reasonably adjudicated King's *Batson* and *J.E.B.* claims. Second, we explain that the Georgia courts reasonably rejected King's *Strickland* claims. Third, we explain that the Georgia courts reasonably rejected King's challenge to Georgia's burden of proof for a guilty-but-intellectually-disabled verdict. And fourth, we affirm the ruling that King forfeited his other intellectual-disability arguments.

### A. *King's* Batson *Claims*

The Supreme Court has established a three-step process for evaluating objections that a prosecutor exercised his peremptory strikes on the basis of race or sex. *See J.E.B.*, 511 U.S. at 144–45. At the first step, "the defendant must establish a prima facie case by producing evidence sufficient to support the inference that the prosecutor exercised peremptory challenges on the basis of race [or sex]." *Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1199 (11th Cir. 2013). At the second step, "the burden shifts to the State to come forward with a neutral explanation" for its strikes. *Id.* (quoting *Batson*, 476 U.S. at 97). At the third step, the trial court must find, as a matter of fact, whether the defendant has established purposeful discrimination. *Id.* Typically, "the decisive question will be whether counsel's race- [or sex-]neutral explanation for [the] peremptory challenge should be believed." *Id.* (citation omitted).

The trial court must "consider all relevant circumstances" at the third step, and the conviction cannot stand if even one of the strikes was discriminatory. *Id.* at 1199–1200. When a court considers a *Batson* claim in an appeal or a state habeas proceeding, the "state court's written opinion is not required to mention every relevant fact or argument" for its merits determination to receive deference on review by a federal court. *Id.* at 1223. Instead, the petitioner must prove that the state court failed to consider that argument or fact. *See id.* at 1222–23.

King has not met the high standard required to set aside the Georgia courts' adjudications of his objections. Although this

appeal presents a troubling record and a prosecutor who exercised one racially discriminatory strike and ranted against precedents of the Supreme Court of the United States, King's argument that the Supreme Court of Georgia failed to consider all relevant circumstances fails. Moreover, the district court correctly found that King failed to exhaust his challenge to the McTier strike when he declined to raise those arguments on direct appeal. And a fairminded jurist could agree with the decision to reject King's challenges with respect to prospective jurors McCall, Ford, Burkett, and Gillis. There is no clear and convincing evidence to overcome the presumption that the factual determinations regarding those prospective jurors were correct.

### 1. King Has Not Established that the Georgia Courts Failed to Consider All Relevant Circumstances.

King first argues that we should review the Georgia courts' decisions *de novo* because they unreasonably applied *Batson. See Adkins*, 710 F.3d at 1250. He cites our decision in *McGahee v. Alabama Department of Corrections*, 560 F.3d 1252 (11th Cir. 2009), where we explained that the "failure to consider 'all relevant circumstances' as required by *Batson* [is] an unreasonable application of law," *id.* at 1262. King contends that the Supreme Court of Georgia failed to consider the discriminatory Alderman strike, the statistical evidence of discrimination by Johnson, Johnson's speech about *Batson*, and the racial overtones of a trial of a black defendant for the murder of a white woman. To support his conclusion that the Supreme Court of Georgia did not consider these circumstances, King points

out that the court did not explicitly discuss them and argues that consideration of those circumstances would lead any reasonable court to accept his claims. We agree that these circumstances are relevant to the *Batson* inquiry, but King has not established that the Supreme Court of Georgia failed to consider them.

Neither *McGahee* nor any other of our precedents requires state courts to show their work in *Batson* decisions by mentioning every relevant circumstance. *See Lee*, 726 F.3d at 1219 ("The state court's unreasonable application of *Batson* [in *McGahee*] was not the failure to mention, but the failure to even implicitly consider [relevant circumstances.]"). A petitioner must do more than prove that the state court failed to "mention" evidence in order to prove that the state court failed to consider that evidence. *Id.* at 1223. This "no-grading-papers, anti-flyspecking rule" stems from "'the presumption that state courts know and follow the law' and [section 2254(d)'s] 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Meders v. Warden, Ga. Diagnostic Prison*, 911 F.3d 1335, 1350 (11th Cir. 2019) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)); *see also Pye*, 50 F.4th at 1036–38; *Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1311–12 (11th Cir. 2016) ("[W]e will not presume that a state court misapplied federal law, and absent indication to the contrary will assume that state courts do understand clearly established Federal law as determined by the Supreme Court of the United States."(internal quotation marks and citation omitted)).

20-12804                  Opinion of the Court                    23

King has also not established that "[t]he court clearly limited its review" to some reasons and "did not implicitly review" the circumstances King proffers. *Cf. McGahee*, 560 F.3d at 1264. The Supreme Court of Georgia acknowledged the Alderman strike and that King had established a prima facie case of discrimination based on the pattern of strikes. *See King*, 539 S.E.2d at 795. Nothing in the Supreme Court of Georgia's opinion suggests that it did not consider Johnson's rant or the obvious racial overtones in King's case, so we must presume that the court did consider the circumstances King cites.

The dissent's conclusion that the Supreme Court of Georgia did not reasonably apply the *Batson* framework relies on a misunderstanding of how we evaluate state-court *Batson* decisions. According to the dissent, the same circumstances on which King relies, taken together, required that the Supreme Court of Georgia find at least one, perhaps several, *Batson* violations. But the dissent does not specify which adjudication was unreasonable and instead evaluates King's individual *Batson* claims *de novo*. Dissenting Op. at 8–15; *cf.* 28 U.S.C. § 2254(d)(1). Moreover, as the dissent at times acknowledges, we do not review the reasonableness of state-court *Batson* decisions in gross based on a judgment that the prosecutor must have engaged in some discriminatory strike somewhere; instead, "*Batson* violations are evaluated juror-by-juror." Dissenting Op. at 11. Neither *McGahee* nor *Adkins*, on which the dissent relies, dictate otherwise.

The dissent argues that the Alderman strike means that this appeal is similar to *McGahee*, in which this Court held that the Alabama Court of Criminal Appeals was not entitled to deference because it "fail[ed] . . . to consider the State's articulation of an explicitly racial reason for striking" a juror, 560 F.3d at 1263–64. *See* Dissenting Op. at 10 ("[T]he trial court's finding that Alderman was struck for a racially discriminatory reason represents the sort of explicit racial discrimination evidence that was dispositive in *McGahee*.") But this case is nothing like *McGahee*. There, the Alabama court's opinion, by its own terms, clearly limited its analysis to exclude the explicitly racial rationale for a strike. *See McGahee*, 560 F.3d at 1264 (quoting from the Alabama court's opinion, which "read the record as providing two reasons," and not the racially explicit reason, for the strike). The Supreme Court of Georgia, in contrast, never said that it considered only the facts that it explicitly mentioned in its *Batson* analysis. And in *McGahee*, the state appellate court's error was ignoring crucial evidence about a strike that the trial court *upheld* at *Batson* step three. *McGahee*, 560 F.3d at 1264. The error was not failing to infer another *Batson* violation from a discriminatory strike that was *remedied*, as the Alderman strike was.

*Adkins* likewise does not support the dissent's argument. Like *McGahee*, the *Adkins* decision held only that the application of *Batson* to a specific prospective juror was unreasonable. *See Adkins*, 710 F.3d at 1251–52. And in *Lee*, we cautioned that "a significant part of the . . . rationale and analysis in *Adkins* [was] inconsistent with Supreme Court and our Circuit precedent." *Lee*, 726 F.3d at 1220–21. The holding was acceptable only because in *Atkins* "[e]ven

if we were to indulge every maximum factual inference from th[e] evidentiary record and credit every reason given, it would not be good enough to make the no-discrimination ruling reasonable." *Id.* at 1223.

The dissent purports to review whether the Supreme Court of Georgia properly applied the *Batson* framework, but in substance it only disagrees with the factual determination about Johnson's credibility. Contrary to the dissent's framing, we must review the reasonableness of the state courts' bottom-line *factual* finding about Johnson's reasons for his strikes under the standards Congress has prescribed in section 2254(d)(2). *Contra* Dissenting Op. at 9–10 (applying section 2254(d)(1) instead of section 2254(d)(2)). We address that argument in the following section, keeping in mind of course, the background facts about Johnson's other strikes. *Cf. Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019) (explaining that a prosecutor's past discriminatory behavior is relevant to evaluating the credibility of race-neutral explanations for strikes).

2. The Supreme Court of Georgia Reasonably Adjudicated the Facts.

We now turn to King's arguments that the state courts "accepted demonstrably false reasons as legitimate grounds for the removal of qualified black jurors and white female jurors" and so made unreasonable determinations of fact. *See* 28 U.S.C. § 2254(d)(2). King faces a high hurdle at this stage. We cannot review King's arguments *de novo* unless he has provided "clear and convincing evidence" that the state court was wrong to credit

Johnson's non-discriminatory justifications for his strikes. *Id.* § 2254(e)(1); *see also Rice v. Collins*, 546 U.S. 333, 338–39 (2006) (explaining that a state court's decision at *Batson* step three is a presumptively correct factual determination).

As *Batson* requires, we evaluate the state-court decision in the light of all the relevant circumstances, including the four that we have already discussed, but we emphasize that two of them, the Alderman strike and Johnson's rants, cannot bear the weight that the dissent places on them, especially when the trial court was witness to both. The trial court found the Alderman strike discriminatory but found the other strikes lawful, and we should hesitate to second-guess its distinction among the strikes. Likewise, unlike the dissent, we do not treat Johnson's rants as decisive evidence that Johnson would discriminate against black jurors if *Batson* did not stop him. *See* Dissenting Op. at 12–13. We must draw inferences in favor of the state court's adjudication, and if we do, the rants, while inappropriate, do not prove that Johnson wanted to discriminate based on race. Johnson complained that statistics should be used evenhandedly to show discrimination by both the prosecution and the defense. And he complained that *Batson* required him to focus on a juror's race to address a potential *Batson* challenge, though before *Batson* he could ignore race. These—to be clear, misplaced and futile—arguments attack the procedures that the Supreme Court of the United States has crafted to detect and remedy racial discrimination in jury selection, but they do not necessarily support an inference that the prosecutor wanted to be free to racially discriminate in jury selection.

We do not reach the merits of overruling King's objection to the McTier strike. The district court ruled that King did not exhaust his state remedies for his objection to the McTier strike, although it incorrectly labeled King's failure to exhaust as "procedural default." *See* 28 U.S.C. § 2254(b)(1)(A). That ruling is not properly before us. The district court did not include it in its certificate of appealability, and although we granted King's request to expand that certificate, our expansion did not reach the McTier strike because King did not mention it in his request. King now asks in his brief for a *second* expansion of the certificate of appealability, but he does not argue that this appeal is an "extraordinary" situation that warrants expanding the certificate of appealability after briefing. *See Hodges v. Att'y Gen., State of Fla.*, 506 F.3d 1337, 1341 (11th Cir. 2007). Nonetheless, the facts of the McTier strike are relevant background when assessing the reasonableness of the Georgia courts' other *Batson* adjudications.

The Georgia courts reasonably rejected King's objection regarding McCall. King points to white jurors who had reservations about the death penalty but were not rejected. But the prospective jurors he identifies said little more than that they would want to see all the evidence in a case before imposing the death penalty. It was reasonable for the Supreme Court of Georgia to conclude that, although Johnson was mistaken about an aspect of the record regarding McCall's husband's voir dire, he was not inventing a pretext for a racial motive. *King*, 539 S.E.2d at 796; *cf. Lee*, 726 F.3d at 1226 (holding it reasonable to conclude that "an honestly mistaken but

race-neutral reason for striking [a potential juror] did not violate *Batson*").

We also hold that the state courts reasonably addressed the Ford strike. The Supreme Court of Georgia credited Johnson's explanation that Ford's status as a single mother would make jury service a burden on her and that Ford was the only person who said she *enjoyed* working with intellectually disabled people. *King*, 539 S.E.2d at 796. King has provided no clear and convincing evidence that the Georgia courts were wrong to accept this explanation. King is correct that at the *Batson* hearing Johnson focused on the burdens of jury service on Ford's childcare, not the financial concerns that the Supreme Court of Georgia identified. But that difference does not make the Georgia court's decision unreasonable. It was reasonable for the court to infer that the financial burdens of jury service would affect a single parent disproportionally. And Johnson's primary rationale for the strike, in any event, was that Ford enjoyed her work with special-needs children. This rationale, which the Supreme Court of Georgia also considered, *id.*, is all the more plausible because King mostly compared Ford to *other women* who also worked with intellectually disabled people but did not say that they enjoyed that work. The Supreme Court of Georgia was reasonable to reject the argument that Ford's sex was the reason for the strike.

Johnson said that he struck Burkett based on his strict rule against having ministers on juries and because she knew King's family. The Supreme Court of Georgia affirmed the trial court's

acceptance of these rationales and explained that Johnson "consistently questioned male and female jurors of all races during voir dire about the roles they served in their places of worship" and that "none of the other prospective jurors were ministers." *Id.* at 795. The Supreme Court of Georgia also stated that although her connections were not uniquely close as compared to other prospective jurors, Burkett had connections to King's family. *Id.*

The Georgia courts reasonably applied *Batson*. King does not provide any evidence that the family connections played no role in the strike; he can only prove what the Georgia court acknowledged: that Burkett's connections were not unique enough, standing alone, to explain striking her. *Id.* But the family connections were not the only explanation for the strike.

King argues that Johnson did not save a strike to use against Thomas Lightsey, a white member of the venire pool who was also a minister. So, according to King, Lightsey must have been acceptable to Johnson. The Supreme Court of Georgia, he argues, was wrong to say that "none of the other prospective jurors were ministers," and we should conclude that Johnson's no-minister rule was pretextual. *Id.* We disagree.

As the district court correctly explained, Lightsey was the 41st juror in the venire list, the second to last, so it was highly unlikely that he would be reached before 12 jurors were selected. And he was not reached. If we give the Supreme Court of Georgia the benefit of the doubt, as we must, *Meders*, 911 F.3d at 1350, it might not have considered Lightsey a "prospective" juror because of how

unlikely it was that he would be reached and selected. But even if the Supreme Court of Georgia misread the record, that error would not entitle King to relief. As we explained recently, we review not "the particular *justifications* that the state court provided" but the broader "*reasons*" for the decision. *Pye*, 50 F.4th at 1036. The district court was correct to supply an alternative *justification*—Lightsey's place in the list of potential jurors—for the state court's *reason* for the decision: that it was not an abuse of discretion for the trial court to accept Johnson's explanation of the strike. We cannot rely on a possible misstatement by the Supreme Court of Georgia to set aside its decision when King has otherwise failed to prove that the no-minister rule was pretextual.

Finally, we affirm the ruling as to prospective alternate juror Gillis. Gillis, Johnson explained, was neighbor to both King's aunt and Smith's uncle. King argues that Gillis's residence could not have been the real reason for her strike because Johnson did not strike white jurors who also had connections to King and his family. He suggests that a prosecutor concerned about family or personal connections would have struck other prospective jurors who, respectively, ran a video store at which King was a customer, conducted a medical procedure on King, went to school with King's sister but had no contact with King, worked at the lunchroom at King's middle school, and possibly taught King and his sister in middle school. We consider it reasonable to distinguish between, on the one hand, living close to King's close family member and a close family member of his co-defendant and, on the other hand, any of the acquaintances the other prospective jurors had. *Cf. King*, 539 S.E.2d at 796.

And even if drawing those distinctions was not sound trial strategy on Johnson's part, it was reasonable for the Georgia courts to have credited them as Johnson's sincere, if misguided, reason for striking Gillis. We lack authority to set aside that decision.

King's *Batson* challenges fail. "[H]abeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (internal quotation marks and citation omitted). The Georgia courts reasonably applied *Batson* when they rejected King's remaining objections after sustaining one of them, which was corrected by seating the improperly stricken juror. King has not proved that the Georgia courts generated an "extreme malfunction" in his case.

## B. The Georgia State Court Reasonably Rejected King's Strickland Claims.

To prevail on a claim of ineffective assistance of counsel, King must prove that his counsel's performance was objectively deficient and that this deficient performance prejudiced him. *Strickland*, 466 U.S. at 687. King argued that his trial counsel inadequately investigated and presented evidence of his mental illness at trial and mitigating childhood-adversity evidence at sentencing. The state court rejected these arguments on the merits, so we must defer to the state court's decision—here, that of the Georgia superior court because it gave the last reasoned decision on the merits, *see Wilson*, 138 S. Ct. at 1193–94—unless it was "not only erroneous, but objectively unreasonable," *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003); *see*

28 U.S.C. § 2254(d). And Supreme Court precedents "require that the federal court use a doubly deferential standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (internal quotation marks and citation omitted).

The superior court applied the correct legal standards and reasonably found that King's counsel conducted an extensive investigation to prepare for trial and adequately presented a case for intellectual disability, mental illness, and mitigating circumstances. King's criticisms of his counsel's trial decisions do not establish that "no fairminded jurist," *Raulerson*, 928 F.3d at 995 (internal quotation marks and citation omitted), could find that King's counsel performed at "an objective standard of reasonableness," *see Strickland*, 466 U.S. at 688. Because we defer to the state court's reasonable determination that King's counsel performed competently, we need not address whether better assistance of counsel would have changed the outcome of King's trial. *See Carey v. Dep't of Corr.*, 57 F.4th 985, 989 (11th Cir. 2023) ("Because a petitioner must prove both deficient performance and prejudice, a court need not address one element if it determines that the petitioner has failed to prove the other.").

1. The State Court Applied the Correct Legal Standards.

King's criticisms of the Georgia court's understanding of the governing law fail. To begin, it was not unreasonable for the superior court to count Jackson's extensive capital-defense experience in his favor. When we evaluate counsel's performance, the

presumption in favor of trial counsel "is even stronger" for "an experienced trial counsel." *See Lawrence v. Sec'y, Fla. Dep't of Corr.*, 700 F.3d 464, 478 (11th Cir. 2012) (citation omitted). Of course, "even the very best lawyer could have a bad day," *id.* (citation omitted), so the superior court could not afford Jackson's experience conclusive weight. But it did not do so; it took that experience into consideration as the background for its evaluation. That deference to counsel's experience, required of federal courts in our Circuit, was not an unreasonable application of *Strickland*.

King also argues that the court should have considered that Johnson was found ineffective under *Strickland* in another case. Failure to do so, he argues, unreasonably disregarded *Strickland*'s command that courts consider "all the circumstances" when evaluating deficient performance. 466 U.S. at 688. And it is not fair, King argues, to consider an attorney's experience as a factor weighing against a finding of ineffective assistance while refusing to consider past failures as a factor weighing in favor of such a finding. We disagree.

The state court could have reasonably read *Strickland*'s reference to "all the circumstances" in the light of the requirement that reasonableness must be evaluated "on the facts of the particular case." *Id.* at 690. One past instance of ineffective assistance does little to establish whether King's rights were violated, so it was not an unreasonable application of *Strickland* for the state court not to consider it. Nor does Supreme Court precedent foreclose taking

extensive past experience into account while ignoring a single failure on counsel's part.

Finally, King argues that "the fact that [his] counsel conducted some mitigation [investigation] cannot, on its own, preclude a finding of ineffectiveness." By "focusing on what trial counsel presented," he says, "the state habeas court's analysis was also unreasonable" because it ignored what counsel "*could have* presented to King's sentencing jury." Again, King's argument is misplaced.

The state court did not apply the wrong standard. Counsel's investigation before trial "need not be exhaustive" but only "adequate." *Raulerson*, 928 F.3d at 997. So "[t]o determine whether trial counsel should have done something more in their investigation, we first look at what the lawyers did in fact." *Id.* (alteration adopted) (internal quotation marks and citation omitted). The superior court correctly considered King's criticisms of his counsel's performance in the light of counsel's actions and not based on King's suggestions of ideal trial strategy.

2. The State Court's Conclusions Were Reasonable.

King challenges the superior court's treatment of his *Strickland* claims regarding both deficient performance and prejudice. He argues that the state court "unreasonably discounted" his evidence of mental illness. King contends that counsel could have presented a stronger case for schizophrenia at trial and rebutted charges of malingering. And competent counsel could have presented a more sympathetic mitigation case by highlighting other aspects of King's

difficult childhood. He argues that the state court unreasonably determined that he was not prejudiced at sentencing by the lack of mitigating evidence. And he argues that the state court unreasonably found that he was not prejudiced by the presentation of certain witnesses only at the sentencing phase and not at the guilt stage. Because King's arguments about deficient performance fail, we need not reach his arguments about prejudice.

Fairminded jurists could agree with the conclusion that King's counsel performed in a constitutionally adequate manner. *See Richter*, 562 U.S. at 102. As to King's family and background, counsel conducted a lengthy background investigation, and the superior court reasonably discounted King's argument that counsel should have presented evidence of childhood abuse or familial mental illness. Although counsel may have been vaguely aware of mental illness in King's family, counsel reasonably focused their limited resources on King's mental health, especially because neither King nor his sister revealed any parental abuse in their interviews, nor any specific family history of mental illness. "An attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him." *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999). King also takes issue with the amount of detail the jury was provided regarding King's childhood, but the superior court reasonably concluded that the jury was informed that King had an extremely difficult background and that King had not proved that his counsel performed inadequately by "not presenting evidence that

could be potentially aggravating . . . [or] cumulative." *See Rhode v. Hall*, 582 F.3d 1273, 1287 (11th Cir. 2009).

It was also reasonable to reject King's argument that counsel should have employed additional expert witnesses or supplied the expert witnesses with more records. Jackson could reasonably decline to rely on hospital records and doctors from a source that he had found unreliable in the past and that had evaluated King negatively. And King does not explain why the records that he presented to the experts in relation to his state habeas petition are fundamentally different from what his experts reviewed in preparation for trial, so he cannot prove that counsel's performance was the reason for the weaker schizophrenia case he made at trial.

King had to prove that "from counsel's perspective at the time," a competent attorney would have crafted a better case for schizophrenia. *See Strickland*, 466 U.S. at 689. At most, King brought evidence that some doctors were more confident of King's schizophrenia in *2012*, but the possibility of proving schizophrenia in 2012 does not establish that counsel unreasonably failed to provide better evidence of schizophrenia at trial in 1998. The superior court reasonably found that King failed to satisfy his *Strickland* burden and instead merely "later secured a more favorable opinion of an expert than the opinion" his trial counsel presented. *See McClain v. Hall*, 552 F.3d 1245, 1253 (11th Cir. 2008). And although King now argues that counsel should have called Dr. Beck, who was more confident about King's schizophrenia during the relevant, pre-trial period, the superior court correctly rejected that argument. King's

counsel was reasonably concerned that Dr. Beck, who had spent so little time with King compared to his other experts, was vulnerable to credibility attacks by the prosecution. And regardless, counsel is not ineffective whenever more witnesses could have been called. *See Rhode*, 582 F.3d at 1285.

Contrary to King's arguments, the superior court did not reach its conclusion based on an unreasonable categorical rule against affidavit evidence. The court weighed those affidavits against the live testimony of King's counsel that they could not have secured further mitigation or mental-illness witnesses and chose to give trial counsel's testimony greater weight. That decision was reasonable, especially in the light of the often-recognized tendency of petitioners to submit self-serving affidavits that do not accurately reflect the circumstances at the time of trial. *See Waters v. Thomas*, 46 F.3d 1506, 1513–14 (11th Cir. 1995) (en banc) ("It is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating circumstance evidence . . . . But the existence of such affidavits . . . usually proves little of significance.").

King falls far short of establishing that a reasonable court would have been compelled to find that his counsel conducted a "profoundly incomplete investigation" that deprived him of his Sixth Amendment rights. *Cf. Ferrell v. Hall*, 640 F.3d 1199, 1227 (11th Cir. 2011). As the district court observed, King does little more in his federal habeas petition than reiterate the arguments that he made before the state court and contend that the state court should

have accepted them. And those arguments, as the superior court concluded, do little more than suggest "that other witnesses might have been available or that other testimony might have been elicited from those who testified." (Quoting *Williams*, 185 F.3d at 1236). These arguments are "not . . . sufficient ground[s] to prove ineffectiveness of counsel." *Williams*, 185 F.3d at 1236 (citation omitted).

We need not reach King's argument about the rejection of his contention that trial counsel should have called Cox and Mitchum at the guilt phase of trial and not only at sentencing. The superior court found that the decision "was a reasonable strategic decision made after a thorough investigation." The state court addressed prejudice in the alternative. But King addresses only the prejudice ruling and makes no argument about deficient performance. Because King does not argue that the performance ruling was unreasonable, we lack power to disturb the state court's adjudication of this issue. *See Shinn v. Kayer*, 141 S. Ct. 517, 524 (2020) ("Federal courts may not disturb the judgments of state courts unless *each* ground supporting the state court decision is examined and found to be unreasonable." (internal quotation marks and citation omitted)).

*C. The Georgia Courts Reasonably Rejected King's Challenge to Georgia's "Guilty but Mentally Retarded" Statute.*

King contends that it is unconstitutional for Georgia to require a defendant to prove his intellectual disability beyond a reasonable doubt in order to secure the immunity from the death

penalty that the "guilty but mentally retarded" verdict provides. *See* GA. CODE § 17-7-131(c)(3), (j) (1988). King argues that he is entitled to *de novo* review of this claim because, he contends, it was not adjudicated on the merits by the state courts. *Cf.* 28 U.S.C. § 2254(d) (requiring deference only to state court adjudications on the merits). The Supreme Court of Georgia rejected King's direct appeal before the Supreme Court of the United States decided in *Atkins v. Virginia* that the Eighth Amendment prohibits the execution of intellectually disabled defendants. *See Atkins*, 536 U.S. at 321. But the superior court denied King's petition for a writ of habeas corpus ten years after *Atkins* was decided. And although the superior court addressed King's challenge under Georgia law as an issue of *res judicata*, it also rejected King's federal-law *Atkins* argument on the merits because the *Atkins* Court implicitly approved Georgia's statute by citing it favorably. *See id.* at 313–14, 317.

King admits, as he must, that his challenge fails if the state court adjudicated his claim on the merits. We have already held that a state-court rejection of an *Atkins* challenge to the Georgia statute is reasonable. *See Raulerson*, 928 F.3d at 1001–03; *Hill v. Humphrey*, 662 F.3d 1335, 1347 (11th Cir. 2011) (en banc). *Atkins* "did not address the burden of proof to prove intellectual disability, much less clearly establish that a state may not require a defendant to prove his intellectual disability beyond a reasonable doubt." *Raulerson*, 928 F.3d at 1001.

### D. King Forfeited Any Direct Challenge to His Conviction Based on His Intellectual Disability.

The district court correctly rejected King's other arguments based on his intellectual disability. The district court found that those arguments "were not briefed, and thus King cannot satisfy his burden." King challenges this forfeiture ruling. He argues that he presented the basic facts supporting his claim in his petition for federal relief, if not in his actual brief, and contends that he did not have to brief his claim to preserve it. King is mistaken: ordinary forfeiture rules, under which a party forfeits an argument by failing to adequately brief it, apply to habeas proceedings in the district court. *See Butts v. GDCP Warden*, 850 F.3d 1201, 1208 (11th Cir. 2017). So King had to make more than the skeletal argument in his petition to preserve these issues. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). The district court had the discretion to reject King's arguments without reaching the merits. *See United States v. Campbell*, 26 F.4th 860, 872–73 (11th Cir. 2022) (en banc).

## IV. CONCLUSION

We **AFFIRM** the denial of King's petition for a writ of habeas corpus.

20-12804                WILSON, J., Dissenting                        1

WILSON, Circuit Judge, dissenting:

The majority correctly notes that a state court need not "discuss every fact or argument to be a reasonable application of *Batson* under § 2254(d)." *Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1214 (11th Cir. 2013). But *Lee* also notes that when there is truly an "abundan[ce of] racial discrimination evidence" in the record, we may find the state court's *Batson* decision was indeed unreasonable. *Id.* This is one of those cases.

There were eight black potential jurors in King's venire. Assistant District Attorney (ADA) John Johnson struck seven of them. When King argued that ADA Johnson's strikes reflected racial bias in violation of the Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 79 (1986), ADA Johnson launched into two lengthy soliloquies suggesting his open disdain and outright contempt for *Batson*. King made a prima facie case of racial bias as to each of ADA Johnson's strikes. The trial court found that ADA Johnson acted improperly when he struck Jacqueline Alderman because she was: "a black female from Surrency." This is clear evidence of racial discrimination. According to *Lee*, we can and should find that the Supreme Court of Georgia unreasonably applied *Batson*.

In my view, because King overcomes the Antiterrorism and Effective Death Penalty Act (AEDPA) deference, he is entitled to de novo review of his claim. *Adkins v. Warden, Holman CF*, 710 F.3d

1241, 1250 (11th Cir. 2013).  Consequently, I would find that he has proven a *Batson* violation, and thus King is entitled to habeas relief.[1]

First, I will highlight some relevant facts from jury selection. Second, I will address the relevant circumstances that the Supreme Court of Georgia failed to consider in conjunction with one another and thus unreasonably applied *Batson*.  Lastly, because I believe King overcomes AEDPA deference, I will review the record de novo.

**I.**

Jury selection began with a pool of 168 potential jurors from which fifteen would be selected: twelve as members of the petit jury and three as alternate jurors.  Ultimately, fifty-four potential jurors were found qualified to serve, and the remaining potential jurors were excused.

Before the peremptory strikes, the racial makeup of the venire included thirty-four white potential jurors and eight black potential jurors.[2]  Of the forty-two potential jurors, seven jurors raised their hand indicating they knew King, knew who King was, knew of King, or knew of any member of King's family.  Four of

---

[1] Because I would reverse on King's *Batson* claim, I would not decide King's remaining claims.  *See Conner v. Hall*, 645 F.3d 1277, 1294 (11th Cir. 2011).

[2] In the alternate pool, there were ten white jurors and two black jurors.  Based on the striking sheet, ADA Johnson accepted seven white jurors and one black juror.  ADA Johnson did not excuse any white jurors but struck one black juror, Gwen Gillis.

those jurors were white—Rebecca Griffin, Martha Vaughn, James Edwards, and Connie Arnold. Three of those jurors were black—Jacqueline Alderman, Lillie Burkett, and Maurice Vann.

Of the forty-two potential jurors, twenty-four raised their hand showing they held various positions of leadership in their church. Sixteen of those jurors were white, including James Orvin and Aubrey Lynch, who were deacons, and Thomas Lightsey, a minister. Eight of those jurors were black, including Jaqueline Alderman, a deaconess, and Lillie Burkett, a minister.

In total, ADA Johnson used only three of his ten strikes for white potential jurors and the remaining seven strikes for black potential jurors. He did not strike a single white potential juror who raised their hand to indicate that they knew of King and his family, but he struck all three black jurors who did the same. ADA Johnson accepted fourteen white jurors who held leadership positions in their church. The two remaining white jurors were not reached during the selection process. ADA Johnson struck seven black jurors who held a position of leadership within their church. Following the exercise of the peremptory strikes, the petit jury consisted of eleven white jurors and one black juror.

In asserting a *Batson* challenge, King argued that ADA Johnson's use of peremptory strikes supported a prima facie case of discrimination because ADA Johnson struck seven of eight black qualified jurors. King brought juror-specific *Batson* challenges to each of the seven black qualified jurors.

At *Batson* Step One, the trial judge found that King established a prima facie case of discrimination for ADA Johnson's exercise of his peremptory strikes. ADA Johnson responded:

> First, let me say this, Your Honor: that I object to the Court finding that, and I object to the Court's finding based on the fact that it's simply on statistical analysis that the State struck eight blacks and three whites, and that has no rational basis on whether a prima facie case of discrimination has been established in this particular case. I state that for the record. I know the Court's ruling, and I know the issue that has been decided by the Supreme Court of Georgia. I do state for the record that the Supreme Court of Georgia of course does not know how I strike, and that it is improper for them to involve themselves in this unless defense counsel can point to a specific reason why some particular juror was qualified to serve and that I struck them. I have always objected to the use of statistics to establish the fact that a prima facie case has been laid. If I wanted to point to statistics, I could show and point out that defense counsel struck only white people. That's all he ever struck. He had the option, the ability, to strike two in the main panel, in the alternates, to strike two people who were black, and he did not do so, one of which, Mr. Carzell Rooks[,] sat there and said over and over and over and over and over again that if a certain set of facts were established he'd have to vote for the death penalty, which, I would assume, be the reason, if I raised the issue, he would have struck a lot of other people, and

I might be able to show that his strikes therefore would be pretextual. And I point that out merely to support the fact that statistics can never make a prima facie showing. The Supreme Court of Georgia has said that it does, and I just take exception to that, and I do so for the record.

We would suggest, Your Honor, that there is a better approach to this matter, and that is that, if a side wants to raise the Batson issue, that that side that raises it should first have to show that their strikes were absolutely non-racially motivated or sexually- or gender-motivated, and only if they did that would it shift to the opposite side to make their strikes known to the Court. I think that becomes very unwieldy, and that's why neither this Court nor the Supreme Court nor the defense should be involved in deciding whether or not the State has accurately or effectively performed its strikes.

After ADA Johnson expressed his views about *Batson*, he proffered nondiscriminatory, race-neutral reasons for exercising each of his peremptory strikes under *Batson* Step Two. The trial judge found that the strike of Jaqueline Alderman was improper but the remaining strikes, including Sarah McCall and Lillie Burkett, were proper.

As to the strike of Alderman, the record demonstrates that the trial court found ADA Johnson's reasons to be dubious, and that Alderman did not really know King's family and she did not know

6                    WILSON, J., Dissenting                    20-12804

King.  The trial judge further found that ADA Johnson engaged in purposeful discrimination under *Batson* Step Three.

Upon the trial judge's finding that ADA Johnson's strike of Alderman was discriminatory, the following exchange occurred:

> Mr. Johnson: [W]hy should we do that?  Why not just—I mean I don't have—first of all, I have a problem that if I say, find out that somebody knows the family and I can't—excuse me—give me a moment.
>
> The Court: Calm down.  Get yourself, your thoughts proper and then tell me what you want to tell me.

After taking a moment, ADA Johnson again started on his views about having to comply with *Batson*:

> I find it improper for this Court to tell me that I cannot decide, when I listen to what somebody says and look at them, that they know the family, that they've been living in this community for 35 years, that that's not a justifiable strike.  If that's the case, then 90 percent of the strikes that I've taken, and 100 percent of the strikes the defense takes in a case are irrelevant.
>
> If this lady were a white lady there would not be a reason—there would not be a question in this case. And that's the problem I have with all of this is that it's not racially neutral.  There was a time when it was racially neutral and that was before *Batson*.  Because I had to act that way when I was in Brunswick because it was a physical impossibility if you wanted to strike every black off a jury for you to do that.  And we had

20-12804                WILSON, J., Dissenting                7

an issue just—*you had to reform your whole ideas and then Batson came out*.  And *Batson* now makes us look [at] whether people are black or not.  Not whether they're black or white, but black or not.  And I may be arguing for the Supreme Court in this particular case and not for this [C]ourt, which I probably am, but it just, it is uncalled for to require people to be reseated on a jury that I have a problem with in this case.

This lady sits on this jury and all of a sudden out comes the fact that back during the life of this man's mother and father they were alcoholics, they beat him, or they ignored him, or they—and she sits there and says well I remember that.  Then I'm screwed, to use the vernacular.  Not because I know that's what's going to happen because my experience is anyone who knows the family and has that much time involved in the community, those are the people that hang up a jury.  That's my experience.  And when I base it on my experience and then this Court says that's not a good enough reason, then I take issue with this entire whole process, both to this Court and to the Supreme Court of Georgia.  It's improper and it's wrong.

What I would suggest this Court to do now that I've had my say, and I'm sorry, I'm very angry right now.

(emphasis added).  Next, ADA Johnson stated that he would not change his strikes, but the parties agreed to remove the selected

8                    WILSON, J., Dissenting                    20-12804

twelfth juror and reseat Alderman to remedy ADA Johnson's discriminatory strike.

The jury convicted King of malice murder. *King v. State*, 539 S.E.2d 783, 788–89 (Ga. 2000). The next day, the trial judge accepted the jury's recommendation to sentence King to death. *Id.* at 788 n.1. On November 30, 2000, the Supreme Court of Georgia denied King's *Batson* claims on direct appeal and affirmed King's convictions and sentence. *Id.* at 795–96, 802.

When addressing King's *Batson* claims, the Supreme Court of Georgia noted that the trial judge found King met the prima facie showing of discrimination but then found that "the trial court did not abuse its discretion in finding that King failed to carry his burden of persuasion as to the jurors challenged in this appeal." *Id.* at 795. Despite King arguing that the trial court failed to consider relevant circumstances, the Supreme Court of Georgia neglected to discuss how those relevant circumstances did or did not support King's *Batson* claim. Next, the Supreme Court of Georgia pointed to the race-neutral reasons provided by ADA Johnson related to each challenged juror to support its holding. *Id.* at 795–96.

## II.

King argues that the Supreme Court of Georgia unreasonably applied *Batson* by failing to consider: (1) ADA Johnson's discriminatory strike against Alderman—the reseated black juror; (2) ADA Johnson's statements, comments, and actions during the *Batson* hearing; and (3) a racially disproportionate striking pattern.

20-12804                WILSON, J., Dissenting                    9

In *Batson*, the Supreme Court ruled that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." 476 U.S. at 89. In turn, to protect the core guarantee of equal protection, *Batson* established a three-step inquiry to evaluate the prosecutor's use of peremptory strikes.[3] *Id.* at 96–98.

King's appeal focuses predominately on *Batson* Step Three. This step requires the trial judge to determine whether the defendant has established purposeful discrimination, "the decisive question will be whether [the prosecutor's] race-neutral explanation . . . should be believed." *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (plurality opinion).

Since "the concern is that a state court failed to follow *Batson*'s three steps," my analysis is under AEDPA § 2254(d)(1). *McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1256 (11th Cir. 2009). An "unreasonable application" results where there are "explicit racial statements and strong evidence of discriminatory purpose," such

---

[3] The Supreme Court summarized the three steps of *Batson*'s inquiry in *Miller-El v. Cockrell*:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

537 U.S. 322, 328–29 (2003) (*Miller-El I*) (internal citations omitted).

that no reasonable and fairminded jurist could have considered "all relevant circumstances" and still found no *Batson* violation. *See Lee*, 726 F.3d at 1213.

Applying this framework, I would hold that the Supreme Court of Georgia's decision was an unreasonable application of *Batson* and its progeny because the Supreme Court of Georgia failed to consider all relevant circumstances. *See Batson*, 476 U.S. at 96. Particularly, the trial court's finding that Alderman was struck for a racially discriminatory reason represents the sort of explicit racial discrimination evidence that was dispositive in *McGahee*. And further, in my view, the trial transcript showing ADA Johnson's clear hostility to *Batson* and the statistical evidence of racial bias is "strong evidence" of a discriminatory purpose infecting ADA Johnson's whole scheme of striking. *Adkins*, 710 F.3d at 1253. Taking all that together and even deferentially reviewing the Supreme Court of Georgia's opinion, no reasonable jurist could have reviewed this record—replete with evidence of racial discrimination—and not found a *Batson* violation. Accordingly, King has carried his burden under AEDPA.

First, the Supreme Court tells us that *Batson* challengers may present evidence of a "relevant history of [the prosecutor's] peremptory strikes in past cases." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019). Relevant history of prior peremptory strikes based on race bears on the question of present discrimination. *See id.* Yet even in the absence of a history of unconstitutional strikes, any discriminatory strikes within the same case are highly relevant

evidence bearing on discriminatory intent and provide strong evidence that the prosecutor may have struck other jurors for discriminatory reasons as well. *See id.* And we have discussed how the articulation of an "explicitly racial reason for striking" a juror factors into the relevant circumstances analysis at *Batson* Step Three. *McGahee*, 560 F.3d at 1264.

King points to ADA Johnson's strike of Alderman. The trial court concluded that ADA Johnson's proffered reason for striking Alderman was not credible and ruled that this strike was unconstitutional under *Batson*. I am unpersuaded by the State's contention, advanced at oral argument, that the trial court did not find Alderman was struck for an explicitly racial reason. Once the prima facie case of discrimination has been made at *Batson* Step One, the State has only one obligation if it in-fact acted for a nondiscriminatory purpose: proffer its truthful reason for striking the juror. *See Miller-El I*, 537 U.S. at 328. If the trial court concludes, as it did for Alderman, that the State is being untruthful, then that is a finding that the State acted for a discriminatory reason. *See McGahee*, 560 F.3d at 1264.

Because *Batson* violations are evaluated juror-by-juror, I do not suggest that one *Batson* violation in a case necessarily renders all other jury strikes *Batson* violations. But just as a prosecutor's discriminatory strikes in other cases can suggest they acted discriminatorily in this case, a finding of discriminatory intent within the same trial is also probative. *See Miller-El I*, 537 U.S. at 346. It is very strong evidence and must be considered when evaluating

challenges to the other strikes at *Batson* Step Three.  As a result, ADA Johnson's improper strike of Alderman within the same case is a relevant circumstance to be considered.

Second, "[i]n the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed."  *Hernandez*, 500 U.S. at 365.  But the Supreme Court noted that "[t]here will seldom be much evidence bearing on that issue."  *Id*.  So "the best evidence often will be the demeanor of the attorney who exercises the challenge."  *Id*.

There is ample evidence here of ADA Johnson's demeanor.  As excerpted above, ADA Johnson's two separate soliloquies show his hostility and disdain for having to comply with *Batson*.  After the trial court found a prima facie case of discrimination, ADA Johnson's prolonged speech ended with the fact that he believed the courts should not "be involved in deciding whether or not the State has accurately or effectively performed its strikes."  Then, after the trial court found ADA Johnson's strike of Alderman was improper because it amounted to purposeful discrimination, ADA Johnson again launched into a speech about why he finds it improper for the court to tell him who he can and cannot strike from the jury because "*Batson* now makes us look [at] whether people are black or not."

ADA Johnson's rants demonstrated, at a minimum, that he was reluctant to abide by the requirements of *Batson*.  Further, those speeches strongly suggested that ADA Johnson would

continue to violate *Batson* if it weren't for the enforcement mechanisms put in place by the courts. ADA Johnson's demeanor, as demonstrated by his lengthy speeches, is highly probative evidence when considering all the relevant circumstances at *Batson* Step Three.

Lastly, as *Batson* explained: "total or seriously disproportionate exclusion of [blacks] from jury venires is itself such an unequal application of the law . . . as to show intentional discrimination." 476 U.S. at 93 (internal quotations and citation omitted). Further, "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *Id.* at 97; *see also Miller-El I*, 537 U.S. at 342 (finding that "the statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason" where the prosecution struck 91% of the eligible black venire members with ten of their fourteen peremptory strikes). "[I]n the statistical analysis courts must consider the statistics in the context of other factors in a case, such as: the racial composition of the venire from which the jurors were struck, the racial composition of the ultimate jury, the substance of the voir dire answers of jurors struck by the State, and any other evidence in the record." *Lee*, 726 F.3d at 1224.

The racial composition of King's jury pool (not including the alternates) consisted of eight black jurors and thirty-four white jurors. During the peremptory striking process, ADA Johnson used seven of the State's ten peremptory strikes to remove seven qualified black jurors while striking only three qualified white jurors.

14                    WILSON, J., Dissenting                    20-12804

Statistically, when looking at the composition of the jury pool (again without alternates), 19% of the jurors were black and 81% were white. But after ADA Johnson's strikes, 8% of the jurors were black (i.e., only one black juror) and 92% were white (i.e., eleven white jurors). ADA Johnson struck 87.5% of the qualified black jurors while striking only 8.8% of the qualified white jurors. As a result, the percentage of black jurors in the pool decreased by 57% while the number of white jurors increased.

This pattern constitutes strong evidence that qualified black jurors were removed far more often than qualified white jurors. *See McGahee*, 560 F.3d at 1265. Moreover, the statistical information about ADA Johnson's race-based striking also provides strong evidence of the disproportionate exclusion of black jurors against which *Batson* cautioned. This statistical evidence is highly relevant when conducting the *Batson* Step Three analysis.

These three relevant factors play off and reinforce each other and provide strong evidence of racial discrimination. Even allowing for AEDPA deference afforded to the Supreme Court of Georgia, a reasonable and fair-minded jurist could not have considered all of this evidence under the totality of the circumstances and concluded that *Batson* was not violated. *See Lee*, 726 F.3d at 1213 (explaining that this court's decisions in *McGahee* and *Adkins* held that a state court's decision denying *Batson* relief was an unreasonable application of *Batson* due to "the explicit racial statements and strong evidence of discriminatory purpose in each case"). Consider, ADA Johnson was found to have purposefully discriminated

in striking Alderman.  That finding on its own does not categorically invalidate the rest of his strikes, but then ADA Johnson went on not one, but two unprompted rants critiquing *Batson*.  Those rants were not mere complaints or objections about a trial judge's ruling ADA Johnson didn't like but instead rants demonstrating his hostility to *Batson* as a rule of law that he had to follow.  His rants make the explicit finding of racial discrimination in striking Alderman all the more relevant to each and every *Batson* analysis for the other stricken jurors.  Further, the statistics showing that ADA Johnson struck 87.5% of all qualified black jurors provides strong confirmatory evidence of Johnson's racially discriminatory intent.  Since this record consists of an "abundan[ce of] racial discrimination evidence," I would find the state court's *Batson* decision was indeed unreasonable.  *Lee*, 726 F.3d at 1214.

The Supreme Court of Georgia is required, under *Batson*, to consider "all relevant circumstances." *See id.* at 1212.  Based on this record and considering all the evidence that was before that court (including the pretextual nature for excluding other black jurors), no reasonable and fairminded jurist could have considered all of this evidence and found that *Batson* was not violated as to the other black jurors stricken from King's jury pool.  Thus, I would conclude that the Supreme Court of Georgia unreasonably applied clearly established federal law.

### III.

Because I would have determined that the Supreme Court of Georgia's decision is an unreasonable application of federal law

under AEDPA, I would review the record de novo to determine whether ADA Johnson violated *Batson* during jury selection.  I consider the following: (1) ADA Johnson's striking of potential black jurors because of their familiarity with King or his family; (2) the relevant circumstances discussed above; and (3) the lack of support for ADA Johnson's proffered neutral reasons for striking black jurors.  Lastly, I review ADA Johnson's reasons for striking Lillie Burkett, finding that strike was motivated by discriminatory intent.

First, of the potential jurors who knew of King or his family, only black potential jurors were struck.  ADA Johnson asked the familiarity-related questions to panels of jurors in a broad manner, asking whether they knew "of" King or his family.  Three white potential jurors—Griffin, Vaughn, and Edwards—discussed their familiarity with King or his family, but ADA Johnson did not strike any of them.  ADA Johnson only struck a juror for familiarity with King when the potential juror was both familiar *and* black.  No white jurors who were familiar with King were struck, but all black jurors who were familiar with King were struck.  *See Miller–El I*, 537 U.S. at 344–45 (discussing the evidence of a prosecutor's disparate questioning and investigation of black and white potential jurors in the case).

Next, as I discussed above, the record contains several relevant circumstances that weigh against ADA Johnson's proffered race-neutral reasons for exercising a challenged peremptory strike. *See id*. at 342 (considering the statistical evidence about a prosecutor's strikes of black potential jurors versus white potential jurors);

*Hernandez*, 500 U.S. at 365 (explaining that "the best evidence often will be the demeanor of the attorney who exercises the challenge"); *Flowers*, 139 S. Ct. at 2243 (finding that the relevant history of the State's peremptory strikes supports a *Batson* claim).

Furthermore, ADA Johnson's proffered neutral reasons for striking black jurors are not supported by the record. Take, for instance, Sarah McCall. ADA Johnson said he struck Sarah McCall because "[s]he indicated that the death penalty was not her first choice. She had a lot of hesitancy about her. I did not make up my mind about [Sarah] McCall until after we voir-dired her husband, who was Richard McCall and in the next panel."

But Richard McCall testified that he did not know his wife's position on the death penalty. Without checking the record, the trial judge found no discrimination in the strike of Sarah McCall. But the strike of Sarah McCall is another instance where ADA Johnson misstated the record to support his strike of a black potential juror. *See Snyder v. Louisiana*, 552 U.S. 472, 482–83 (2008) (considering when the record contradicts a prosecutor's explanations for striking jurors).

A de novo review of the record also reveals the pretextual nature of ADA Johnson's explanations for striking Lillie Burkett.[4]

---

[4] I would also conclude that the record reveals that ADA Johnson impermissibly struck alternate juror Gwen Gillis in violation of *Batson*. Simply put, the race-neutral reasons proffered by ADA Johnson, as well as his further explanations of the Gillis strike, are unfounded.

Burkett explained that she lived in Surrency, and that she knew both the families of King and Crosby, but that she did not personally know King.  Burkett also served as a minister in her church.

> During the *Batson* hearing, ADA Johnson explained:
>
> I said that this lady fell into the same category like Ms. Alderman does, that she knew the family and knew the defendant in this case, and I did not feel that, because of that relationship and the fact that she's a minister and my feeling about ministers and what their position in the community is, that that would make her a fair juror, and that's why she was struck.  Two reasons, not just one.

First, ADA Johnson claimed that he struck Burkett, in part, because she knew King's family.  Although Burkett stated that she knew King's family, ADA Johnson did not ask Burkett a single question about her familiarity with King's family nor about how that relationship might impact her ability to serve as a juror.  Indeed, ADA Johnson's failure to engage in any meaningful voir dire examination on a subject about which he allegedly was concerned is evidence suggesting that the proffered race-neutral explanation is pretext for discrimination.  *Miller-El v. Dretke*, 545 U.S. 231, 246 (2005) (*Miller-El II*) (finding it "difficult to credit" a prosecutor's reasons for striking a juror because they "reek[ed] of afterthought" and had "pretextual timing").  Burkett's testimony, elicited by the trial judge, indicated that she knew King's family, but she specifically stated that she did not know King "personally."

But later, when further defending his strike of Burkett in light of the record and the outcome of the *Batson* hearing, ADA Johnson made a peculiar comparison between Burkett and Alderman as excerpted above. The comparison appears to me that ADA Johnson sought to use familiarity with King or his family as a way to cover up his striking of black jurors.

Furthermore, many white potential jurors were familiar with King, his family, or both, but these ties only warranted a peremptory strike when the potential juror was black. For instance,[5] white qualified juror Rebecca Griffin, who was accepted by both ADA Johnson and King's counsel and served on the jury, went to school with one of King's sisters, and King went to school with Griffin's brother. Like Burkett, Griffin agreed with the prosecutor that it would be fair to say that she had no personal contact with King himself, but the record does show familiarity with King's family—far more than what was elicited from Burkett by the trial judge or ADA Johnson during individual voir dire.

Second, ADA Johnson claimed that he struck Burkett, in part, because she was a minister. But the record shows that there was another minister among the potential jurors: Thomas Lightsey.

---

[5] Other examples include two qualified white jurors who were accepted by ADA Johnson but struck by King: Martha Vaughn explained that she knew King "when he was coming through" middle school because she worked in his middle school's lunchroom and had contact with King during the lunch period, and James Edwards believed he had possibly taught King during middle school.

During the parties' preemptory strike process, Lightsey was the forty-first juror out of forty-two who were qualified to sit on the petit jury. In exercising their strikes, the parties considered thirty-nine jurors. In exercising all of his ten strikes to seat the jury, ADA Johnson—despite his adamant refusal to accept ministers—left it to chance whether Lightsey would be reached.

Thus, while ADA Johnson technically had no opportunity to "accept" Lightsey as a juror, his exhaustion of State peremptory challenges during jury selection suggests Lightsey was likely acceptable to him. This is reinforced by the fact that ADA Johnson did not ask Lightsey, a minister at Big Creek Primitive Baptist Church (a fact elicited by King's counsel, not ADA Johnson), about the leadership position that he held in a church. In fact, during the general voir dire, when ADA Johnson asked Lightsey's panel whether anyone held a position in the church, Lightsey raised his hand. The record shows that ADA Johnson asked Lightsey only one follow-up question, whether he had any opinion about which way the case should go, a fact reflecting that Lightsey's position in the church was inconsequential to ADA Johnson.

ADA Johnson's (and the majority's) argument that Lightsey does not matter because he was not reached during striking is neither here nor there. The point is, ADA Johnson offered as his race-neutral reason for striking Burkett that he adamantly refused to seat ministers. The fact that ADA Johnson appeared indifferent to a white minister on the jury undercuts that race-neutral reason.

Moreover, there were many other potential jurors with leadership positions in the church. Specifically, two white jurors who were deacons sat on the jury: James Orvin and Aubrey Lynch. Orvin was "the deacon and chairman of [his] deacon board." Lynch, who served as the jury foreperson, testified that he was a deacon at Satilla Baptist Church. ADA Johnson never asked any other potential juror the details of and how long they had served in their respective church leadership positions. Thus, the contention that ADA Johnson cared about Burkett's position as a minister is diminished. The record reflects that ADA Johnson was aware of white individuals who participated in their respective church communities, and yet ADA Johnson did not appear to have an issue with them serving on the jury.

When "[c]onsidering all of the circumstantial evidence that 'bear[s] upon the issue of racial animosity,' [I am] left with the firm conviction that [ADA Johnson's strike of Burkett was] 'motivated in substantial part by discriminatory intent.'" *Foster v. Chatman*, 578 U.S. 488, 512–13 (2016) (quoting *Snyder*, 552 U.S. at 478, 485).

ADA Johnson used seven out of his ten peremptory strikes to exclude seven out of the eight black jurors from the jury venire. A side-by-side comparison of individual reasons for striking black jurors with white jurors who were not struck reveals a substantial likelihood of race-based considerations in the exercise of those strikes. Thus, the overwhelming evidence in this record compels a finding that ADA Johnson's use of its peremptory strikes to dismiss Burkett constituted purposeful discrimination and violated King's

22                    WILSON, J., Dissenting                    20-12804

rights under the Equal Protection Clause and clearly established federal law under *Batson*. "Equal justice under law requires a criminal trial free of racial discrimination in the jury selection process." *Flowers*, 139 S. Ct. at 2242.

## IV.

For these reasons, I would reverse the district court's order denying King's federal habeas petition.

I respectfully dissent.