# SUPREME COURT OF THE UNITED STATES

## WARREN KING *v.* SHAWN EMMONS, WARDEN

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 23–668.   Decided July 2, 2024

The petition for a writ of certiorari is denied.

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR joins, dissenting from the denial of certiorari.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), federal habeas courts must give substantial deference to factual determinations made by state courts. See 28 U. S. C. §§2254(d)(2), (e)(1). But deference is not a rubber stamp; it "does not imply abandonment or abdication of judicial review." *Miller-El* v. *Cockrell*, 537 U. S. 322, 340 (2003). "A federal court can disagree with a state court's [factual findings] and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Ibid.*

In this capital case, a Georgia prosecutor struck every Black woman and all but two Black men from a jury pool during *voir dire*. Responding to a challenge from the defendant based on *Batson* v. *Kentucky*, 476 U. S. 79 (1986), the prosecutor protested, arguing that it was "improper" for the court to inquire into his reasons for making the strikes. 4 App. in No. 20–12804 (CA11), p. 7. He then proceeded to explain that one of his "main reason[s]" for a specific strike was that "this lady is a black female." *Id.*, at 9.

The trial court determined that this racially discriminatory strike violated *Batson*. In response, the prosecutor erupted into a rant against *Batson*. He repeatedly asserted that it was "improper for this [c]ourt to tell me . . . that's not a justifiable strike." *Id.*, at 43. And he concluded: "I take

issue with this entire whole process . . . . It's improper and it's wrong." *Id.*, at 44.

On appeal, the Supreme Court of Georgia found that none of the prosecutor's other peremptory strikes were racially discriminatory—but nowhere did that court acknowledge the fact that one of the prosecutor's strikes *was* explicitly discriminatory, nor did the court even mention the prosector's drawn-out rants against *Batson*. The Eleventh Circuit then proceeded on federal habeas review to conclude that the state court did not make "an unreasonable determination of the facts" under §2254(d)(2), despite its having completely ignored those highly salient facts.

That was error. The deference that AEDPA requires is not boundless, and when a state court fails to engage with critical evidence in rendering its factual findings, a federal habeas court should not hesitate to deem those findings unreasonable. Because I would summarily reverse the Eleventh Circuit's contrary decision, I respectfully dissent.

I

Petitioner Warren King was charged with malice murder and other crimes for his involvement in the killing of a convenience store employee in the course of a robbery. During jury selection for King's trial, the prosecutor, Assistant District Attorney John Johnson, used 7 of his 10 allotted peremptory challenges to strike every Black woman and all but two Black men. As a result of these strikes, Johnson struck 87.5% of the qualified Black jurors but only 8.8% of the qualified White jurors. Statistically speaking, this meant that Black jurors were about 10 times more likely to be struck than White jurors. The resulting jury consisted of seven White men, four White women, and one Black man.

The defense challenged Johnson's strikes as discriminatory in violation of *Batson*.[1] The trial court determined that

_____
[1] Under this Court's decision in *Batson* v. *Kentucky*, 476 U. S. 79

a prima facie case of discrimination had been made and directed Johnson to explain his strikes, as *Batson* requires. Before complying, however, Johnson made his objection to *Batson* clear in a lengthy speech that included the following assertions:

> "I object to the [c]ourt's finding based on the fact that it's simply on statistical analysis that the State struck eight blacks and three whites, and that has no rational basis to whether a *prima facie* case of discrimination has been established in this particular case. I state that for the record. I know the [c]ourt's ruling, and I know the issue that has been decided by the Supreme Court of Georgia. I do state for the record that the Supreme Court of Georgia of course does not know how I strike, and that it is improper for them to involve themselves in this unless defense counsel can point to a specific reason why some particular juror was qualified to serve and that I struck them. . . . [S]tatistics can never make a *prima facie* showing. The Supreme Court of Georgia has said that it does, and I just take exception to that, and I do so for the record." 4 App. in No. 20–12804, at 6–7.

Johnson capped off his objection by asserting his view that a *Batson*-type analysis "becomes very unwieldy, and that's why neither this Court nor the Supreme Court nor the defense should be involved in deciding whether or not the State has accurately or effectively performed its strikes." *Id.*, at 8. But then he proceeded to offer reasons

———————

(1986), analyzing a claim involving an allegedly discriminatory strike follows a three-step process. First, the defendant must establish "a prima facie case" that the circumstances of the strike "giv[e] rise to an inference of discriminatory purpose." *Id.*, at 93–94. Second, "the burden shifts to the [prosecution] to explain adequately the racial exclusion." *Id.*, at 94. Third and finally, the trial court must determine whether "the defendant has established purposeful discrimination." *Id.*, at 98.

for the particular strikes he had made in this case. The trial court accepted those explanations until Johnson reached prospective juror Jacqueline Alderman, a Black woman. Johnson explained, "My main reason [for the strike] is that this lady is a black female, she is from Surrency, [and] she knows the defendant and his family." *Id.*, at 9. The trial court, however, noted that Alderman had testified that she did not know King or his family. The trial court accordingly found that the strike violated *Batson* and ordered Alderman seated on the jury.

Johnson then made a second oral statement protesting against *Batson*. As before, Johnson's tirade is too long to reproduce fully here, but the following excerpt is emblematic of the position he forcefully maintained:

> "If this lady were a white lady there would not be a reason—there would not be a question in this case. And that's the problem I have with all of this is that it's not racially neutral. There was a time when it was racially neutral and that was before *Batson*. Because I had to act that way when I was in Brunswick because it was a physical impossibility if you wanted to strike every black off a jury for you to do that. And we had an issue just—you had to reform your whole ideas and then *Batson* came out. And *Batson* now makes us look whether people are black or not. Not whether they're black or white, but black or not." *Id.*, at 43–44.

Johnson concluded by emphasizing that, in his view, "it [was] uncalled for to require people to be reseated on a jury that [he] ha[d] a problem with in this case." *Id.*, at 44.

After his speech concluded, Johnson emphasized that he was "very angry right now," *ibid.*, but suggested that the trial court place Alderman on the jury while leaving his other strikes untouched. The trial court and King's attorneys eventually accepted this compromise, and the court did not revisit its prior conclusions regarding Johnson's

other strikes. The newly empaneled jury, consisting of 10 White and 2 Black jurors, ultimately convicted King on all charges and sentenced him to death.

On appeal, the Supreme Court of Georgia affirmed King's conviction and sentence. *King* v. *State*, 273 Ga. 258, 539 S. E. 2d 783 (2000). The state court did not, however, even mention Johnson's repeated, indignant diatribes against *Batson*. Nor did it recognize that Johnson's reason for striking Alderman was explicitly based on race, obliquely referring to that strike only to say that "[t]he trial court found the State's reason for striking juror Alderman to be insufficient to rebut the prima facie showing of discrimination." 273 Ga., at 268, 539 S. E. 2d, at 795.

King filed a petition for habeas corpus in federal court, again pressing his *Batson* claim. The District Court denied relief, and a divided panel of the Eleventh Circuit affirmed. *King* v. *Warden, Ga. Diagnostic Prison*, 69 F. 4th 856 (2023). The court acknowledged that King's case "presents a troubling record and a prosecutor who exercised one racially discriminatory strike and ranted against precedents of the Supreme Court of the United States." *Id.*, at 868. It concluded, however, that the state court's findings were not unreasonable under AEDPA. Judge Wilson dissented. In his view, "even deferentially reviewing the Supreme Court of Georgia's opinion, no reasonable jurist could have reviewed this record—replete with evidence of racial discrimination—and not found a *Batson* violation." *Id.*, at 881.

## II
### A

Under AEDPA, a federal court may not grant habeas relief to a state prisoner based on a state court's factual findings "unless the adjudication of the claim . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State

court proceeding." §2254(d)(2). "A determination of a factual issue made by a State court shall be presumed to be correct"; this "presumption of correctness" must be "rebutt[ed] . . . by clear and convincing evidence." §2254(e)(1). Only after a state court's factual determination is found to be unreasonable can a federal court then assess the merits of a habeas petitioner's claim "without the deference AEDPA otherwise requires." *Panetti* v. *Quarterman*, 551 U. S. 930, 953 (2007). Clearly, this standard incorporates a significant amount of deference to a state court's prior factual findings. "A state-court factual determination is not unreasonable merely because the federal court would have reached a different conclusion in the first instance." *Wood* v. *Allen*, 558 U. S. 290, 301 (2010).

Equally clear, however, is that "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review, and does not by definition preclude relief." *Brumfield* v. *Cain*, 576 U. S. 305, 314 (2015) (internal quotation marks omitted). Put another way, AEDPA's "standard is demanding but not insatiable." *Miller-El* v. *Dretke*, 545 U. S. 231, 240 (2005).

For that reason, this Court has not hesitated to find AEDPA's standard satisfied when a state court's factfinding process disregards information that is highly relevant to a court's factual determination. See, *e.g.*, *Brumfield*, 576 U. S., at 314–316; *Wiggins* v. *Smith*, 539 U. S. 510, 528 (2003); *Dretke*, 545 U. S., at 265–266; see also 2 R. Hertz & J. Liebman, Federal Habeas Corpus Practice and Procedure §32.4, p. 2002, and n. 12 (7th ed. 2023) (collecting lower court cases in which "[t]he state court . . . overlooked or misconstrued evidence"). To be sure, "a state court need not make detailed findings addressing all the evidence before it." *Cockrell*, 537 U. S., at 347. But a state court's disregard for highly salient facts casts serious doubt on the reasonableness of the state court's determination.

B

The Georgia Supreme Court's blinkered assessment of each of prosecutor Johnson's strikes—divorced from context—ignored highly relevant facts and circumstances in three critical areas, each of which should have informed the Eleventh Circuit's AEDPA determination.

*First*, the Georgia Supreme Court ignored the flagrant nature of the *Batson* violation the trial court had already recognized—the discriminatory strike of Jacqueline Alderman. In the state court's telling, this earlier violation was simply one for which the prosecution's "reason for striking juror Alderman" was "insufficient to rebut the prima facie showing of discrimination." *King*, 273 Ga., at 268, 539 S. E. 2d, at 795. But that sugarcoated version of events failed to acknowledge that one of Johnson's "main reason[s]" for the strike was that Alderman "is a black female," 4 App. in No. 20–12804, at 9, and that Johnson's nonracial reason for the strike—that Alderman knew King and his family—was in fact false, as the trial court found. We have emphasized that "historical evidence of the State's discriminatory peremptory strikes from past trials" are highly probative of a prosecutor's discriminatory intent. *Flowers* v. *Mississippi*, 588 U. S. 284, 304 (2019); see also *Dretke*, 545 U. S., at 253–254. All the more, then, when—as in this case—a discriminatory strike had occurred earlier *during the same trial*.

*Second*, the Georgia Supreme Court said absolutely nothing about Johnson's multiple heated outbursts, all of which made his hostility to *Batson* patently obvious. This Court has recognized that "'the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge.'" *Flowers*, 588 U. S., at 302–303 (quoting *Snyder* v. *Louisiana*, 552 U. S. 472, 477 (2008)). Here, that demeanor provided highly probative evidence that Johnson's use of peremptory strikes was suspect. Johnson repeatedly made clear that he disagreed with this Court's decision in *Batson* and believed that courts had no business

inquiring into the reasons for his strikes. As the dissent below noted, Johnson's outbursts "demonstrated, at a minimum, that he was reluctant to abide by the requirements of *Batson*." 69 F. 4th, at 882 (opinion of Wilson, J.).

*Third*, racial disparities in a prosecutor's exercise of peremptory strikes are highly probative of discriminatory intent, and here, "[t]he numbers speak loudly." *Flowers*, 588 U. S., at 305. Again, Johnson struck 87.5% of the qualified Black jurors while striking only 8.8% of the qualified White jurors. In a prior case, we have described this kind of disparity—there, the striking of 10 out of 11 Black jurors—as "remarkable." *Dretke*, 545 U. S., at 240–241. With such stark numbers, "[h]appenstance is unlikely." *Cockrell*, 537 U. S., at 342. This fact, too, does not appear anywhere in the Georgia Supreme Court's opinion.

The Eleventh Circuit should have been attentive to the fact that the Georgia Supreme Court's *Batson* determination exhibited such critical flaws born out of its abject failure to grapple with what actually happened at trial. The state court's watered-down description of Johnson's initial *Batson* violation should have raised alarm bells as the Circuit evaluated the reasonableness of the state court's factual findings under AEDPA. The Court of Appeals also should have had grave doubts about the reasonableness of the state court's factual findings due to its failure to acknowledge the prosecutor's pertinent and disturbing anti-*Batson* rants. And the stark statistical evidence of the prosecutor's discriminatory strike behavior—again, unmentioned by the State Supreme Court—should have served as further confirmation that AEDPA deference to that court's factual findings was not warranted.

In short, the Eleventh Circuit failed to faithfully apply AEDPA's review standard here. Given that the Georgia Supreme Court did not address, or even mention, the prosecutor's expressed antipathy toward *Batson*, the Eleventh Circuit should have deemed AEDPA's unreasonable-

determination standard satisfied and proceeded to review the merits of King's claim without the deference that AEDPA usually requires. See *Panetti*, 551 U. S., at 953. Such a nondeferential review of the strikes at issue here might well have made a difference—as Judge Wilson noted in dissent, there is good reason to believe that King's *Batson* claim would otherwise have prevailed.[2] But the Court of Appeals reflexively deferred to the Georgia Supreme Court, notwithstanding glaring flaws in the state court's factual findings. Even under AEDPA's deferential standard, federal courts play an important role in "'guard[ing] against extreme malfunctions in the state criminal justice systems.'" *Harrington* v. *Richter*, 562 U. S. 86, 102 (2011). The Eleventh Circuit's failure to do so here is deeply unfortunate, and it reflects a neglectful response to the apparent trend of disturbingly lax *Batson* enforcement on the part of Georgia's high court.[3]

\*          \*          \*

*Batson*'s third step requires courts to consider a prosecu-

_____

[2] Even setting aside the highly relevant evidence that the Georgia Supreme Court ignored, there is ample evidence that the state court's analysis of each of these strikes was flawed. "[O]f the potential jurors who knew of King or his family, only black potential jurors were struck," even though "[t]hree white potential jurors . . . discussed their familiarity with King or his family." *King* v. *Warden, Ga. Diagnostic Prison*, 69 F. 4th 856, 884 (2023) (Wilson, J., dissenting). And Johnson's other "proffered neutral reasons for striking black jurors"—such as views about the death penalty or involvement in church—"are not supported by the record." *Id.*, at 884–885.

[3] We are told that, since this Court decided *Batson* in 1986, the Georgia Supreme Court has found a prosecutor's strikes to violate *Batson* only five times, despite having considered the issue in 127 published opinions, and it has not found a *Batson* violation for the past 27 years (since 1997). Brief for Georgia Association of Criminal Defense Lawyers as *Amicus Curiae* 6. In 12 of the cases in which it reviewed *Batson* challenges, the court upheld the prosecution's decision to strike every single Black juror. *Id.*, at 6–7.

tor's "strike in the context of all the facts and circum-
stances." *Flowers*, 588 U. S., at 315. Here, the Georgia Su-
preme Court ignored highly salient facts about the prosecu-
tor's admittedly discriminatory strike behavior and
antipathy toward the legal standards that address such
conduct. Instead, the state court made a narrow assess-
ment of the prosecutor's strikes that lacked important con-
text. Therefore, the state court's denial of King's *Batson*
claim was "based on an unreasonable determination of the
facts in light of the evidence presented in the State court
proceeding." §2254(d)(2). Accordingly, I would summarily
reverse the Court of Appeals' erroneous application of def-
erence in upholding the state court's decision and remand
for reconsideration of King's *Batson* claim "without the def-
erence AEDPA otherwise requires." *Panetti*, 551 U. S., at
953.